We're going to move now to appeal 22-3059. This is Nichols v. Wiersma. We're going to begin with oral argument on behalf of the appellant. And Mr. Jurek, I'm going to recognize you first. Thank you. May it please the court. I am Anthony Jurek. I represent Carl Nichols in this habeas appeal from a state conviction. Would anybody, anyone benefit from a summary of the facts, posture, standard of review? I think we're fine on that. Thank you, Your Honor. So with that, I would also anticipate reserving three minutes of my time for rebuttal. I believe that the briefing has clarified the issues of contention between us and the state is, as I see it, it is the level of deference that the federal courts owe the state court findings of fact. And in this case, it bears repeating that the circuit court and trial court, which I will refer to interchangeably, that was Judge Ellen Burrs in the Dayton County Circuit Court. She was the post-conviction court as well. And then in the Court of Appeals, the decision in that three-judge panel was written by Judge Joanne Kloppenburg. So the circuit court and trial court made numerous findings of fact with extensive citations to the record. While the Court of Appeals reversed the circuit court, it is evident that it did so based on a unreasonable determination of the facts, both of which I think violate or rather satisfy the requirement of a federal habeas claim, that it was an unreasonable application of a clearly established U.S. Supreme Court precedent. Mr. York, can I just confirm, you're pursuing your habeas claim based on Youngblood and Trumpetta, correct? Not Brady? Not what, Your Honor? Not Brady? Yes, Your Honor. So you're claiming this is potentially exculpatory? I'm sorry, Your Honor. I guess I should clarify then. No, we're saying that it is both. In our view, as in the circuit courts, it is absolutely apparently exculpatory. We believe that even if it was potentially exculpatory, the circuit court found bad faith thrice over on the part of the prosecutor, the lead detective, and the sex assault interviewer who conducted the interview. But you're not bringing a Brady claim, correct? Nothing below was briefed as Brady. You rely on Youngblood here, but you have some cases relying on Brady and support. So I just want to make sure I understand precisely what your habeas argument is. Yes, Your Honor. So we have contextualized it purely as a failure to preserve exculpatory evidence under Trumpetta and Youngblood, which in our view answers what to do when the evidence is apparently exculpatory or potentially exculpatory. Now, as it turns out in Trumpetta, of course, and this is a point that goes directly to the Court of Appeals' unreasonable application of federal law, under Trumpetta, even inculpatory evidence, even likely inculpatory evidence, blood which has been tested and found to be over the legal limit, and then we don't have or it hasn't been preserved, even that likely inculpatory evidence, and the Court used the word more likely to be inculpatory than not, is categorized as potentially exculpatory. The Courts further say that when evidence is material, that is the standard. And so for the Wisconsin Court of Appeals in this instance to invent an entirely new category of evidence in the appropriate level of deference to the fact-finding of the circuit court is simply an unreasonable application of clearly established Supreme Court law. When even potentially inculpatory evidence is, in the language of exculpatory evidence, a potentially exculpatory, a list of corrections by a child witness simply can't be otherwise. Mr. York, here's what concerns me about this case. Is it correct that the jury saw and heard both of the interviews in question? Your Honor, I'm struggling to recall. I do not know that they saw those interviews in their entirety. I would suspect that they did not. Do you know? Excuse me? Do you know? I do not know at this moment. Okay, let's not, let's just stick with I don't know then right now. And, but, counsel had access to both of them? Yes. And, the tape of the second interview indicates that this list existed, correct? Yes. Did he ask the, did counsel ask this child when she was testifying at trial anything about the list? No. What concerns me is that the availability of both, well, I'll tell you, what troubles me on the state side is I don't know how the Wisconsin Court of Appeals could just assume that the second version is credible and more credible than the first, okay? But, it does seem to me that if both are available and crosses available to explore any differences and to raise questions about this list, that sounds like plenty of protections, if less than ideal protection, for impeachment of the witness. So, your honor, I'll attempt to answer the three issues that I think that raises. The first is whether, should we win, would the remedy be a new trial? Or, as Judge Burr said, a dismissal without a retrial because a fair trial is impossible. That is to say, could MRW, the victim, now be cross-examined and recall this? I suspect that that's not the case. There's too much passage of time. I don't know if that was your honor's point. It was not. Okay. So, as it goes to ineffective assistance, I will say that with... Ineffective assistance is out at this point because of the procedural default. My problem is, I understand, I believe, how this is potentially exculpatory. It's, in essence, the witness impeaching herself, right? Yes, sir. Okay. But who knows how effective that might or might not be, but given that at least counsel, and maybe the jury, I'll ask the state about that, but that the defense counsel had access to both the recordings and the indication about the list, that seems like plenty of material to be able to explore potential impeachment. Was that done at trial? No, your honor. So, she wasn't cross-examined about the list? No. Okay. So, I'm done in my two minutes. You may reserve the rest of your time. Thank you. Thank you, Mr. Urich. Ms. Comfort, we'll move to you for argument on behalf of the appellee. Good morning, your honor. I guess good afternoon, your honors, and may it please the court. Assistant Attorney General Lisa Comfort on behalf of Lance Weiersma. Your honors, the district court decision was exactly correct on how to evaluate this claim under AEDPA, but before we talk about that, I think, if you would indulge me for a moment, I would like to talk about the harmless error standard under Brecht versus Abrahamson, because I think no matter how the district court would have resolved this young blood claim, there's simply no way that Mr. Nichols can overcome his burden to show actual prejudice here, and here's the reason why. This little girl told this story four different times. She told it to her mother. She told it in her first interview. She told it in her second interview, and she told it to the jury, and she was very, very clear when, I mean, we didn't get a whole lot from mother about whether what she said about some of these things because mom was, you know, on the stand just saying she told me he touched her vagina, but what this little girl said in interview one, interview two, and on the stand was I'm having a hard time remembering, you know, deep peripheral detail. Well, she didn't say peripheral. I'm summarizing. Having a hard time separating out peripheral details about these incidents because I had so many sleepovers over there, and it was so long ago that a lot of them are blurring together in my memory. What she did remember very, very clearly was this assault. She remembered that she was about four or five years old. She was about age kindergarten or first grade. She remembered she could not sleep at night, and that she came upstairs from the basement. Then she could not recall if Mr. Nichols was already in the living room or if he was standing in the kitchen, but what she very did clearly recall is that when she told him that she couldn't sleep, he patted his leg and said, you know, indicated that she could come sit on his lap, and then he said to her, you know, I am not a girl, and I've always wondered what it's like to have a vagina, and can I touch yours? And she did not realize there was anything wrong with this and said sure, and then he put his hands both on the outside and the inside of her vagina, and after about a half an hour, she started getting sleepy again, and she went downstairs into the basement, and she went to bed. She remembers that event very clearly, and she gave the exact same story about that all four times she told it. Now there's a lot more in the record than that, though, that bolsters this girl's credibility, and that is because the jury heard a lot of things that Mr. Nichols told other people that were completely consistent with what this little girl said in both of those interviews and on the stand. So the jury heard about an email that Mr. Nichols sent to this little girl's mother that was talking about the naked wrestling game and the sponge bath, and with both of those things, Mr. Nichols says, yes, those occurred, but please let me explain about them, and that can be found. That was actually read verbatim to the jury. That's at docket 520 between pages 78 and 87. He explained that everything she said about this game was accurate, that the kids would get naked, and they would just do it naturally, and then while he was in his bathrobe, they would try to either pull him off the bed or onto the floor, and he would throw them onto the ground, and he kind of tried to explain that away, saying, you know, it's nothing sexual and whatnot, and then he went on to say, yes, this sponge bath also occurred. Here's what was happening. These, you know, the kids were playing with stamps, and they had them all over their bodies, and yes, I put her in the tub, and when asked why she didn't just wash herself, he said, I don't really know. So we've got that admission from Nichols that also corroborates everything that this little girl said about what was going on over at this house in both of these interviews and in her testimony, and then Officer Harris interviews Mr. Nichols, and he tells her the same thing about the naked wrestling and the sponge bath, and when she informs him that MRW is saying, did you know that this little girl is saying that you touched her vagina? He doesn't deny it. He says, I don't remember that happening. He says, I hope I wouldn't have done that, and when Detective Harris gives him a hypothetical saying, well, you know, that's not really telling me you didn't. I mean, if I asked you if you two ever shot shotguns at each other, it'd be a pretty clear yes or no. Then his only answer was, well, it might have happened late at night when I was taking an Ambien. I don't really remember. So we've got this very consistent and credible story from this little girl who is admitting on the stand and to everybody who's speaking to her about it that she has a hard time remembering exact details and dates about what happened what time over at his house because she was there so many times, but she tells the exact same and consistent story about the assault, which is the important part of what we are having a trial about all four times, and everything else that she relays about the atmosphere and what happened every time she was over at the Nichols house is corroborated by Mr. Nichols himself. So the notion that if trial counsel had gotten up and explored whatever this little girl put on this list that she wanted to change from the first interview to the second interview and that would have made a difference at trial is simply not supportable on the record that we have. And I will say that trial counsel, as Judge Hamilton was observing, he had access to this video. He had, in fact, the second interview at which she brought this list to, that occurred two years before this case ever went to trial, and counsel had the video for well before that. So if they wanted to explore whether this list occurred, they absolutely certainly could, but counsel also had both videos and he got up in inconsistencies between the two interviews that she had. So... Did the jury see both interviews? It's not clear whether they saw the entirety of the second interview. It is in the record that they definitely saw, so they certainly didn't see some of the preliminary portions of the video where it's just getting set up. What we do know from the trial record and the trial's transcripts is they definitely saw the first interview beginning at minute 308 and going to at least minute 322. After that, the transcript kind of just says video restarted and unfortunately we didn't get more timestamps from that, but we know that they saw that and we know that they saw the bulk of the second interview because it's discussed the next day, but again, unfortunately, the trial transcripts, I went over them multiple times, I cannot find a place where they actually put the videos on there. So I don't think we're sure that the jury definitely saw the end of that video. I would imagine that they probably did. But counsel had them. Excuse me? Counsel had them both. Counsel had them both for years before this trial went to trial. And counsel did, you know, he had both of these interviews and he asked us, he cross-examined this little girl about the fact that she had some inconsistencies in between these two stories. He cross-examined her extensively about the fact that when Detective Harris went back to her and tried to pin, see if she could pinpoint when some of these things might have happened in relation to other things that should have been big events in her life and she had, she couldn't do it. And counsel argued extensively in closing argument that because her memory was just too fuzzy and too blurred together and she couldn't be, she couldn't be believed. But there was one glaring error here with trying to make that argument. And that's that this little girl testified that she loved this man like a father and she never wanted to get him in trouble. And she was very, you know, she was upset when her mom wouldn't let him see him anymore. So the motive for this little girl to make this allegation up six years later just wasn't there. And as I said, she was very forthcoming when she could remember something and when she couldn't remember something all of these times. And the notion that the discrepancies between these two stories given in their, well in the first interview and the second interview would have completely changed the jury's mind about whether or not this little girl was telling the truth. I just don't think there's any possible supportable way to get to actual and substantial, substantial and injurious effect on the verdict in this case. That being said, to get to Brecht he still has to overcome a DPA deference that the Wisconsin Court of Appeals is due. And I think if you look at the district court's decision, it did exactly what it's supposed to do here. We're not here to determine whether the Wisconsin Trial Court findings of fact were reasonable or whether the Wisconsin Court of Appeals should have deferred to those more. Those are questions of state law. The only question here is was what the Wisconsin Court of Appeals did a reasonable application of young blood and trumpetta and supportable by the record? And the answer here is clearly yes. So how, how does the Wisconsin Court of Appeals come to the conclusion that this couldn't possibly be exculpatory? Well your honor, I think it reaches that conclusion because when you look at how this series of events was playing out, she has the first interview. It turns out that Kansas conducts these interviews in a different way than Wisconsin does and so they didn't ask her some of the questions that we would need to get it admitted into evidence. So they send her back for a second interview because Wisconsin requires an oath that you're going to tell the truth. I'm sorry can I finish the question? Wisconsin requires an oath that the kid either knows the difference between a truth and a liar is going to tell the truth during the interview. Kansas does not do that. So you know the state of Wisconsin says can you please do this again? Apparently the procedure for that was going to be that she was going to watch her first interview and then give an oath saying everything I said in that first interview was true. Kansas kind of you know biffed it a little and just had her watch the first interview and then brought her back in and asked her all these questions about truth and a lie and you know made her take the oath and then kind of just re-asked her the questions that they had asked her the first time and then were like okay we're done now I think we did what Wisconsin needed and ended the interview. I think the way that the Wisconsin Court of Appeals can come to the conclusion that none of that would have been apparently exculpatory is because this little girl was sitting down watching that first interview trying to make sure she was being completely and totally forthcoming about what she said happened and then she gave the exact same account of the assault in the second interview that she gave in the first one. So there's no way that this little girl had anything on that list that said this assault didn't happen because she made this list trying to make sure she was being completely honest about what was happening. That's a great jury argument okay. But a defense lawyer might be able to treat that very differently. Sure. With inconsistencies and potential I'm sure you've seen cases where family members or others pressured somebody who had made such an accusation to embellish a story or to improve it and so on. So that's why the facts here are so troubling. The facts about the statement of corrections and the way that was handled put aside the assault okay which is troubling enough. And that's why I have serious trouble with the state court's assertion that basically the only way that there's nothing you could possibly do to impeach the second version. Well and Judge something did not go wrong here. I mean this list should have been preserved but had it been by the investigator or trial counsel getting a hold of it. I mean I'm not here trying to defend that fact that this list was lost. But I think when you look at the trial record and the trial court's findings and then what the court of appeals did here I think what they were really trying to say was we don't have any evidence in the record that this was apparently exculpatory and they've still never come forth with any evidence on how this could be apparently exculpatory and they never tried to find any. No one asked this little girl if she could remember what was on that list. No one asked this little girl if she could explain to us what the changes were that she wanted to make before the first and second interview. We don't know. She might still remember today. She testified at trial that her memory at trial was just about as good as she thought her memory was during the second interview. We don't have enough facts to say that they couldn't have gotten comparable evidence elsewhere and we have no facts showing that this had any kind of actual substantial and injurious effect on the verdict and so for that reason we would ask you to affirm the decision of the district court. Thank you Ms. Kumpfer. Thank you. Mr. Yerrick we're going to give you four minutes for rebuttal. Thank you. That is longer than I anticipated. All the same I think I'm going to have to try to talk faster. So I'm noting that most of the state's presentation just now is on what this case is not about. It's not about actual prejudice but if it were we've got the word of the judge who presided at the trial who said that her confidence was shaken in it. That's the opinion that matters. The state has conceded that the Wisconsin Court of Appeals has made no that leaves this court's deference to all it leaves a federal court's deference to are the findings of fact made by Judge Burrs and the evidence presented at a state court proceeding. The only state court proceeding at which evidence was presented and findings of fact were made by the state's own concession was the circuit court. We have this appellate review of the video. Do you want to talk about that? Thanks Judge Brennan. I do just briefly. The missing evidence with the video in order to say that their standard of review was the same as the circuit courts would be. It is not. Judge Burrs explicitly premised each of her three findings of bad faith on the conduct of the witnesses or the prosecutor that that were in the room. She explicitly mentioned Holzrichter the sex assault interviewer and the lead investigator and the prosecutor and their demeanor in court as she was making these findings. So assuming I think that what that leads into is the point that the district court did not get this exactly right. This is essentially a de novo review. You don't know that the district court's any deference. You're looking at a legal issue but I think it's nominally instructive to observe that the way in which they aired was by affording so much deference to the court of appeals that they needed to imply or infer facts that that court did not find explicitly in order to sustain its ruling. That is exactly. The court of appeals as I remember this correctly found that in essence the bad faith finding was unsupportable by the record. Is that outside the bounds of federal constitutional bounds of the role of a state court? It is not judge. Now I would say that the court of appeals is empowered to do that. I would say that in this case on a view of the evidence as established in the state court proceeding that the court of appeals was unreasonable in that application but I don't want to act like they don't have the power to do that. They absolutely do. What makes it unreasonable? You've said that a couple times and you said in your determination after he's viewed the videos as Judge Brennan said unreasonable or an unreasonable factual determination. Thank you your honor. I believe that what makes it unreasonable is looking at the written rationale of the court of appeals vis-a-vis the written rationale of the circuit court. Why do we have to compare the two? Why can't we just look at what the court of appeals judge decided? Because what is required is a deference to the facts found based on the evidence at a state court proceeding. And again the only the only state court proceeding was the circuit court. So it's to say that even though the court of appeals is absolutely empowered to overrule the Dane County District Court they didn't explicitly and to infer that they must have done it implicitly is exactly contrary to habeas and the precedent outlined in our briefs. That's my time although I'd welcome any questions. Thank you very much Mr. Urich. We appreciate your presentation. Thank you very much Ms. Comfort. We do as well. The case will be taken under revision.